Mr. Schaefer. Thank you, ma'am. Please, the court. John Schaefer on behalf of Syntest. This matter before the court raises three matters of claim construction, the first being an ordered sequence, the second being each shift clock pulse comprising a clock pulse in normal mode, and the third being capture clock. In each of these instances, Cisco is seeking this court's decision to narrow the ordinary meaning of those terms. And for that to occur, this court must find somewhere in the record a clear intent, clear objective intent by the applicant for such narrowing. Will they find that in the specification? You can find that in the specification. It's not in the specification here. So where did the lower court judge get it wrong? Well, I think what the lower court first focused on, and it comes to the three reasons for this. The first reason was there is a reference when we're talking about the ordered sequence. We're talking about the first element now. The ordered sequence, there are various methods to do it. The specifications discuss one particular method or two particular methods, which we categorize together as a causal method. And in the specifications, it refers to that as the present invention. And there is case law that this court has issued where the present invention can serve as a narrowing. But I would refer this court to the recent decision that I believe Judge Lori was on, the pacing technologies versus Garmin case. Because in this case, and what's important about this case, is that there is no dispute among the parties that the use of present invention is not consistent. In fact, it's used about 58 times throughout the specifications to refer to a number of elements. And the best way to find out that... Did that suggest more limiting? More limiting... More limiting in a lot of respects. That's exactly what... Incorporated the spec by reference right into the claim. That's exactly what pacing technology dealt with. In pacing technology, there were 19 elements that were decided. And in that opinion, the court specifically says, look, there's 19 various elements that have been identified as objects or features of the present invention. And in that case, as in here, where some of those items or features appear in the claims, and then also appear in the dependent claims, you would never consider that the applicant is using the term present invention as limiting. In pacing, this court found it limiting because as to one of those particular features or objects, they specifically said, all of these features and objects that we've previously identified, all of these 19, are found in this one embodiment. And they said, so we'll depart from the rule where it's used inconsistently as to apply to this one, because all 19 were adopted into the one. Well, what kind of construction do you think was too limiting? In this instance? Yes. In this case, when we're talking about ordered sequence, the claims don't identify any particular method for ordering the sequence. So any method should be permissible. And going just to my example... Including the prior art versions of ordered sequence? Absolutely, including the prior art. Let me get to that issue right now. There was a discussion by Cisco that the absence of us, the absence in the file history during prosecution of us saying we included all other methods should be sufficient to limit us to the causal methods. But what's important in that case, in the file history, is the examiner rejected our claims as obvious in light of two patents by Norodowski. Norodowski uses the programming technique. If Cisco's construction was correct, the most obvious response for us would have been they use programming, we use causal. We didn't do that. We didn't narrow our claims based on a particular method. We distinguished Norodowski on the grounds that Norodowski teaches a launch on shift method of delay fault testing. And Norodowski requires a particular form of alignment that we don't require because we're completely separate. So you're absolutely right. In our patent, we do talk about this causal technique. And why do we talk about the causal technique? Because the causal technique could not be the prior art methods of programming, but we can also use this causal technique. When I read your patent, I saw that the core idea was this triggering mechanism in terms of this tight relationship between the capture clock pulses from one clock domain causing triggering the capture clock pulses from a different clock domain. And that was the foundation of the patent. And then that's reinforced given that every example in the spec uses the daisy chain triggering mechanism. The specification defines, to an extent, ordered sequence as skewed clocks. I can find the reference in a second. But it says an ordered sequence is skewed clocks. What distinguished our method from the prior art methods was that all the prior methods had multiple capture functions going on in some level of simultaneity. In our system, we completely separate the operations of those. And the only evidence then that would support this idea that our invention was this causal triggering method was the use of present invention. And we use present invention inconsistently. The best example of this, I would think, is the penultimate paragraph in the summary of the invention where the specifications say, to summarize, the present invention centers on using a global scan-enabled signal for driving all scan-enabled signals at a reduced clock speed and applying an ordered sequence of capture clocks for capturing the output response in self-test and scan-test. What's important about it are two things. A, we don't reiterate any method for deordering. But B, more importantly... But everything in the lead-up to this is all about the token ring clock enabling technique and the daisy chain clock triggering technique. It's no different than identifying it as a preferred embodiment. We use that in the... You didn't quite say it like that, though. It says present invention. So the issue is, can you use present invention here as a limiting construction? And when you go to this penultimate reference to the present invention as central... The text reads, present invention isn't the only way to use something that is a translation and a specification into understanding certain words in a claim, right? Absolutely. But you need other indicia of a clear intent. And the only other indicia you would have... I mean, what separates present invention from preferred embodiment is that the court has determined that if you use present invention, there are instances where you can find... Where is the indicia in this patent that this claim for an ordered sequence of capture clocks encompasses an embodiment that has a programmable capture window? That's what was known in the prior art at the time. I know, but you couldn't possibly be arguing that your claim covers the prior art. I mean, please don't say that. We're not arguing it covers the prior art. It covers that prior art method. What distinguishes our invention from the prior art is not the method of achieving an ordered sequence. That is unique to our patent, but just because something is unique to our patent doesn't have to be what is claimed. And I would go back to the... But what in the spec tells a reader that the inventor is contemplating that his claimed invention covers a programmable capture window embodiment? It indicates that any method can be used. It doesn't... While it defines that as the preferred embodiment, when you look at the claim language, the claim language simply says an ordered sequence. So you're now reading a limitation from the claim language into the body of the claim. And that would make sense if, in the prosecution history, the examiner or the inventor had made some effort to say this causal triggering method is what distinguished us from the prior art. We didn't. We found other things to distinguish. You didn't include the programmable sequence, did you not, in the prosecution history? No. As a distinction? No. Absolutely not. Notodosky... Then why all the emphasis on the ordered sequence? The emphasis on the ordered sequence is because it is a technique that cannot be used by the technique taught by Notodosky or the technique taught by Hetherington. We can use all systems plus we can use a system that those forms of achieving a sequence cannot use because we completely skew the testing mechanisms where they don't. They have them moving simultaneously so they could never have a causal triggering method to have that. And then let's get to the other reasons why it cannot be causal triggering. The patent is clear that it incorporates a scan cell that uses an additional to a multiplexing scan cell. It uses a level-sensitive scan latch. A level-sensitive scan latch does not switch between shift and capture using a scan-enable signal. There's no requirement for a scan-enable signal with that method. Do we have an expert testifying to that effect or do we have something in the record that makes that... Absolutely. I made that point to Judge Graywell at the hearing and we had it in our reply brief. But besides you telling us that, I don't know anything about level... I can't even remember the word. Level-sensitive scan latches. Level-sensitive scan latches and level-sensitive scan designs and whether or not they require or don't require the use of a scan-enable signal. Well, I don't believe there's any dispute before this panel that they don't require it. And I think I explained this in the opening brief. With a multiplexing system, you basically have one path going into the scan cell. So you need something to switch between scan and back down to capture. With a level-sensitive scan cell, you have two paths going in. A path for scan and a path for capture. Before we get into this complex story, I understand the reason why you're making this argument is to be able to say that the usage of the term present invention uses a scan-enable signal can't possibly mean that the scan-enable signal is a necessary component of every single claim because one of the claims uses this level-sensitive scan latch, right? Yes, and an additional... But I guess a counter to that is do we even need to go down this rabbit hole about LSFDs if it's unnecessary to deem the usage of the term present invention in this patent every some kind of definitional moment? That's absolutely correct. And you don't need to get into the analysis of the level-sensitive scan latch either because a global scan-enable signal, which has been identified in the penultimate paragraph as a present invention, is dependent claim form. And under the doctrine of claim differentiation, that in and of itself indicates it's not part of the independent claim. Dependent claim three is the use of the scan-enable signal. So that tells you that it's not required in claim one. And so if what they're saying here is the present invention is found in a dependent claim, which is what the pacing technology case held, then present invention, if you deem it the present invention, you're violating the presumption of claim differentiation and you're rendering claim 27 meaningless because it includes that system that doesn't require it. Let's hear from the other side, and we'll save you a rebuttal time. Mr. O'Queen. Thank you, Judge Newman. May it please the Court. If the Court affirms on the issue of the ordered sequence of capture clocks, the Court does not need to reach any of the other that is dispositive, as Sintest concedes at page nine of its reply brief. Of course, if there are questions on the other issues, I'm happy to answer them. Sintest told the public in no uncertain terms what its invention did and did not require in providing the claimed ordered sequence of capture clocks. They clearly said that the present invention uses a daisy chain triggering or clock, excuse me, or token ring clock enabling technique to generate and order the capture clocks one after the other. Indeed, every figure, every embodiment, every discussion in the summary of the invention on how to order capture clocks involves one of these triggering techniques, making this case very much like the Vernetics decision. There's no inconsistency in how the patentee used the term the present invention, and what I mean by that is there's no contradiction. It's not like they say in one circumstance the present invention uses daisy chain, and in another circumstance the present invention uses programmable capture windows. Quite the opposite, Sintest distinguished its invention from the prior art. It specifically said that programmable capture windows require clock suppression or programming complex timing waveforms. How do you understand clock suppression? In what sense should I? How would you translate that? What does that mean? Well, I think what that's referring to is when you control it so the signal's not actually sent. That is that instead of the signals all running continuously, you tell, it's basically like time slicing. This one will go at this time, this one will go at this time, and so I think the difference between the claimed invention with triggering and with clock suppression is the difference between having a set of dominoes where you knock down the first and that causes the next one. Could triggering also be a form of clock suppression? At least as I understand the word clock suppression if what we're talking about is just organizing clock pulses in a way where you're not running them all simultaneously at the same time, they're being sequenced. I don't think so, Judge King, for two reasons. First, I think what clock suppression is talking about is to use the domino analogy. Instead of a situation where one domino causes the next one to fall, it's a situation where you have spaced out dominoes and at a pre-ordered time someone walks up and knocks down a domino, whether or not the one before it falls, whether or not the one after it later falls. Second, you have a situation where they specifically say that the invention, quote, does not require applying clock suppression. This is at A140 column three where the patentee not only says what the present invention is, but it says what the present invention is not and what it does not require. As long as it's not using clock suppression, it's also bundling up that attribute with a bunch of other attributes that are all related to Hetherington. If it's disclaiming something, it's disclaiming Hetherington with all of those attributes combined. It's not just singling out clock suppression as a standalone and saying, we don't do clock suppression. Well, I think, Judge Shins, what it's doing is it's saying that it doesn't require any of these techniques. It says it does not require using shift clock pulses in the capture window, it doesn't require applying clock suppression, it doesn't require complex timing waveforms. They are distinguishing that was all required. This is just like frenetics in the sense that you have the patentee identify a problem. It identifies a problem with the prior techniques and the problem is that you can't do at-speed testing of asynchronous clocks. It says that we've solved that problem and it says that the way that we've solved that problem is by using daisy chain or token ring triggering in which, quote, the test results are repeatable no matter what clock speed will be used for each capture clock. In other words, even when the clocks are asynchronous. They actually distinguish the priority. What do you think about column one, lines 55 to 56? This is what your opposing counsel reference without actually giving us the site. Where it's talking about the prior art and says none of them can provide multiple skewed capture clocks, parentheses, or an ordered sequence of capture clocks, close parentheses, in each capture cycle during self-test or scan test. So, right there, there's perhaps a suggestion there with the parentheses that when it's talking about an ordered sequence of capture clocks, it's talking about multiple skewed capture clocks. Well, Judge Chen, when you look at column one, it identifies one of the problems with the prior art being clock skews. So, this is A139 at line 39 and specifically identifies that because of clock skewing, you end up with a fault propagation problem. That is, you can't know that things won't necessarily be triggered at the same time because even when you have synchronous clocks, they may be off. And certainly when you have asynchronous clocks, it is difficult, if not impossible, to make sure that they're not going to trigger at the same time. And that's why the invention, excuse me, that's why the patent then goes on and explains in column four and in column five how they solve that problem. And the way they solve that problem is through generating and ordering capture clocks one after the other by triggering. And in fact, if you look at the prosecution history and the point that my colleague was referring to, it actually gets to the same point because they say, and this is at A323, most importantly, most importantly, the present invention can allow the testing of asynchronous clock domains. And it gives an example of those, unlike the prior art. And the way that it does that, and I think this is explained well by the district court at A20 footnote 36, the district court explained, to avoid the problem, it identifies the problem, the difficulty of at speed testing of asynchronous clocks. The asserted patents explain the invention uses a daisy chain clock triggering or token ring clock enabling technique to generate and order the capture clocks. This technique provides a major benefit enabling the use of asynchronous clock domains. And so where you have a situation as here, where as in Honeywell, they've told the world what the present invention requires. There's no reference in here in which they say the present invention uses programmable capture windows or uses clock suppression, which is the only other technique that could potentially be used in that regard. There's no inconsistency in that. You have a disparagement of the prior art. You have an explanation for how the invention solves that problem. And I think that makes this case like the decision in Vernetics, like the decision, frankly, in pacing technologies versus Garmin, which we embrace, which reiterated that the present invention language is the language of disavow or disclaimer, unless you have a situation where there's an express contradiction and there's nothing of that sort here. Can I ask you about the second claim construction dispute? Sure, you're on. Which the lower court relied on as an alternative ground for non-infringement. Yes, you're on. Including the three patents. Yes, you're on. That claim limitation is in the preamble of claim one of the 213. And in a different part of the marking order below, the judge deemed that the preamble was non-limiting. So can you explain to me how this is a legitimate basis for non-infringement, if in a different part of the order, the judge concluded that the preamble was non-limiting? Sure, a couple points, Judge Chin. First, the preamble of the 126 patent is limiting. There's no dispute about that. You're talking about the 213. The only dispute is whether the preamble of the 213 patent is limiting. And if you look at A46 in the record, the parties agreed that the, quote, said shift clock pulses that appear in the body of the claims of the 213 patent, that those refer, quote, to the shift clock pulses introduced in the preamble. So the parties agreed that... Is there any other reference for shift clock pulses in the body of claim one of the 213? Yes, Your Honor. The body of claim one of the 213 refers to, quote, said shift clock pulses. And, of course, said is the language that requires an antecedent. So the necessary antecedents for the said shift clock pulses are the shift clock pulses that are in the preamble. But if there was any dispute or doubt about that, the parties stipulated in A46 that the, quote, said shift clock pulses refer to the shift clock pulses introduced in the preamble. So it's necessarily the language of the preamble. Of course, they then stipulated to non-infringement based on the district court's construction of the term, each shift clock pulse comprising a clock pulse applied in scan mode, which language comes from the preamble, and it follows from the definition of the capture clock. That is, the capture clock is specifically defined as being comprised of the shift clock pulses and the capture clock pulses, and then the next statement is each shift clock pulse comprising a clock pulse applied in scan mode. So we think the disputed term itself comes from the preamble. It necessarily comes from the preamble because that is the antecedent basis. And then the parties stipulated that it comes from the preamble. If the court has further questions on any of the issues, I'm happy to answer them. Otherwise, we will rest on our brief on the remaining points. Any questions? Any more questions? Thank you, Mr. Chairman. Thank you, Your Honor. Mr. Chairman. Thank you, Your Honor. If I could respond to the second point first and then get a chance to talk about the second construction. I was curious about the second construction, which is each shift clock pulse comprising a clock pulse applied in normal mode. That language was added in the file during the prosecution of the patent. Why was it added? It was added because the examiners said you can't have shift clock pulses in the capture clock. That makes no sense. You can define a clock by its function. The function of these clocks can be to capture or they can be to shift. So if you have a capture clock, a capture clock cannot have shift clock pulses in it. Why isn't it reasonable to read the prosecution history as you defining the capture clock in a way that it provides shift clock pulses during the shift mode and it provides capture clock pulses during the capture window? That is one way to read the prosecution history. The prosecution history in that instance said we had defined capture clock to be the test clock, which the examiner rejected, saying no one in the art would understand it to mean that. So we added this language to clearly stand for the proposition that shift clock pulses are only found in the shift clock. That is the shift clock pulse comprising a pulse applied in normal mode. And capture clock pulses only occur in capture clock pulses. So again you have an instance where the lower court added a limitation to this language. He inserted this notion of capture clock. I understand though it does great grammatical violence to read it the way you want to read it. Just read the words that claim each capture clock comprising a selected number of shift clock pulses and a selected number of capture clock pulses. And the examiner indicated that that doesn't make any sense. And we have an instance where Judge Grewal has determined that the preamble is not limited. That doesn't mean you can't consider the preamble, but it's not limited in and of itself. So you would need to apply some of the other rules of construction to it. And what the construction that has been proposed by Cisco is absolutely inconsistent with the file history as to why the language was added and what the language was meant. It specifically says this was to clarify, this language was added, this was to clarify the examiner's concern that a capture clock should contain only capture clock pulses and a shift clock should only contain shift clock pulses. That's at A320. And for then the court to impose a shift clock pulse from the capture clock is completely inconsistent of what was happening in the file history. Let me quickly go back because I have a moment to go back to the first element here. Hetherington and the issues with the distinction of Hetherington is distinguishing the launch on shift technique versus the launch on capture technique being used here. The launch on all methods require clock suppression. As you know from reading these patents, you're going to have your capture clock going and you're only going to release a certain amount of that this cause will trigger and doesn't cause, require suppression. It's just wrong. Hetherington's issue was the alignment issues and we don't require alignment. We don't require alignment because we completely skew. And the other element is we have two very different notions of skew. There is the skew you don't want, which is where you expect alignment and alignment doesn't occur. And the skew we're talking about here, which is the order sequence of capture clocks, which is the complete ordering of the testing that occurs in different domains. That is our invention. We separate the test in domain one from the test in domain two. And all the prior art required some level of simultaneity with respect to those testings. Thank you. Thank you, Mr. Shatner. Mr. O'Quinn, the case is taken under submission.